THE BRUALDI LAW FIRM, P.C.
29 Broadway, Suite 2400
New York, NY 10006
By: Richard B. Brualdi
TELEPHONE: (212) 952-0602
FACSIMILE: (212) 952-0608
EMAIL: rbrualdi@brualdilawfirm.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIMOTHY DAVIDSON, in His Capacity as Trustee on Behalf of WEST PUTNAM AVENUE TRUST, on Behalf of Himself and all Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>BLACKROCK ADVISORS, LLC, BLACKROCK INVESTMENT MANAGEMENT, LLC, and BLACKROCK INTERNATIONAL LIMITED,<br><br>      Defendants. | Case No.<br><br><u>CLASS ACTION COMPLAINT</u> |

Plaintiff Timothy Davidson ("Plaintiff"), in his capacity as trustee on behalf of the West

Putnam Avenue Trust, by his attorneys, alleges as and for his class action complaint, upon

personal knowledge as to himself and his own acts, and as to all other matters upon information

and belief derived from, *inter alia*, a review of documents filed with the Securities and Exchange Commission ("SEC"), press releases issued by the Defendants, and publicly available news sources, such as newspaper articles, as follows:

## NATURE OF THE ACTION

1.     This is an action (the "Action") brought by Plaintiff, whose address is 100 E. Linton Blvd., #400A, Delray Beach, Florida 33483, in his capacity as trustee on behalf of West Putnam Avenue Trust, on behalf of himself and all other similarly situated shareholders of BlackRock Global Allocation Fund, Inc. (the "Fund") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80-a-35(b).  Defendants BlackRock Advisors, LLC ("BRA"), located at 1 University Square Drive, Princeton, New Jersey, BlackRock Investment Management, LLC ("BRIM"), located at 1 University Square Drive, Princeton, New Jersey, and BlackRock International Limited ("BRIL"), located at Torphichen Street 40 EH3 8JB, Edinburgh, United Kingdom (collectively referred to herein as "Defendants" or "BlackRock"), are investment advisers and/or subadvisers to the Fund and receive an annual fee from the Fund for providing investment advisory services, including managing the Fund's portfolio of assets.

2.     Pursuant to § 36(b) of the ICA, 15 U.S.C. § 80-a-35(b), Defendants "have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the Fund] . . . to such investment adviser or any affiliated person of such investment adviser."

3.     This Action alleges that Defendants have breached their fiduciary duty under § 36(b) by charging and receiving investment advisory fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the services rendered and

could not have been the product of arm's-length bargaining.  In this regard, the investment advisory fee rate charged to the Fund by BRA is excessive for the value of the work actually performed by BRA; and the subadvisory fees paid to BRIM and BRIL[1] are excessive in that the overall subadvisor's fee is significantly higher (as much as $51 million more) than the fees negotiated at arm's-length by BRIM with other clients for the same or substantially the same investment advisory services.  Therefore, the excessive fee rates charged by the Defendants have resulted in the Fund paying much more in fees each year than it would pay for investment advisory services had the fee arrangement been negotiated at arm's-length.

4.      BRA delegates almost all of its investment management duties to its Sub-Advisers.  Despite this fact, BRA retains a substantial portion of the fees charged to the Fund. For example, in fiscal year 2013, the Fund paid BRA over $412.5 million in investment management fees.  BRA then paid the Fund's Sub-Advisers $235.1 million, retaining over $177.3 million of the advisory fee for itself despite doing minimial, if any, work.  Indeed, the additional administrative and supervisory services provided by BRA are minimal and, as discussed below, the Fund pays for many of these additional services through separate agreements and/or fees.

5.      Furthermore, the Fund's investment advisory fee arrangement has enabled BRA to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Fund's assets under management during recent years, without appropriately sharing those benefits with the Fund and its shareholders.  It is generally accepted in the mutual fund industry that it is not harder to manage a fund simply because it is bigger.  Therefore, in order to prevent oversized fees, the percentage of assets under management charged as fees by investment

---

[1] Defendants BRIM and BRIL are collectively referred to as the "Sub-Advisers" and the subadvisory fees discussed herein include fees paid to both Defendants BRIM and BRIL.

advisors must decrease as the assets in the Fund grow.   However, the fee arrangement established by the Defendants does not adequately decrease as the Fund grows and, despite the Fund's net assets growing by nearly $5 billion during the 2013 fiscal year (resulting in an additional $30 million in advisory fees for BRA without a proportionate increase in the services provided or a proportionate increase in the cost of such services to the Fund), zero cost savings were passed on to the Fund and its shareholders.   Thus, the increase in fees paid by the Fund has resulted in increased profits for Defendants at the expense of the Fund.

6.     Accordingly, pursuant to § 36(b) of the ICA, 15 U.S.C. § 80a-35(b), Plaintiff seeks on behalf of the Fund, to recover for the damages resulting from the breaches of Defendants' fiduciary duties, including the amount of excessive compensation and payments received by BlackRock and the rescission of the contracts that form the basis for the excessive and illegal fees.

## JURISDICTION

7.     Plaintiff asserts a claim under § 36(b) of the ICA, 15 U.S.C. § 80a-35(b).  This Court has subject matter jurisdiction pursuant to §§ 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. §1331.

8.     Venue is proper in this judicial district pursuant to section 44 of the ICA, 15 U.S.C. §80a-43, and 28 U.S.C. §1391 because Defendants BRA and BRIM are inhabitants of this district, maintain offices in this district, and/or transact business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claim occurred in this district.

## PARTIES

9.     Plaintiff Timothy Davidson, in his capacity as trustee on behalf of the West Putnam Avenue Trust, owns 47,644.62 Institutional Shares in the Fund, valued at approximately $1,031,029.66, and has continuously owned shares in the fund since at least 2012.

10.     Defendant BRA, a registered investment advisor, is a limited liability company organized under Delaware law, with an office located at 1 University Square Drive, Princeton, New Jersey.   BRA was organized in 1994 to perform advisory services for investment companies.   BRA has entered into a management agreement (the "Management Agreement") with the Fund.   Under the Management Agreement, BRA receives for its investment services to the Fund a fee at the annual rate of 0.75% of the Fund's average daily net assets.

11.     Defendant BRIM, a registered investment advisor, is a limited liability company organized under Delaware law.   BRIM's principal office is located within this judicial district at 1 University Square Drive, Princeton, New Jersey.   BRIM is an affiliate of BRA, and serves as the Fund's sub-adviser, for which it receives a fee from BRA equal to a percentage of the management fee paid to BRA under the Management Agreement.   BRIM is responsible for the day-to-day management of the Fund's portfolio.

12.     Defendant BRIL is a foreign corporation organized under the law of the United Kingdom.   BRIL's principal office is located in Edinburgh, United Kingdom.   Prior to July 1, 2013, BRIL also served as a sub-adviser to the Fund, for which it received a fee from BRA equal to a percentage of the management fee paid to BRA under the Management Agreement.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all holders of the Fund's institutional shares. Excluded from the Class

are Defendants and their directors as well as members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

14.     This action is properly maintainable as a class action.

15.     The class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are many thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Fund.

16.     There are questions of law or fact which are common to the Class including, *inter alia*, the following:

(a) Whether the fees paid to BRA and its affiliates are so disproportionally large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining; and

(b) whether the Defendants breached their fiduciary duties under § 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

17.     Plaintiff's claims are typical of the claims of the other members of the Class in that he and all members of the Class have suffered and will suffer the same damage from Defendants' actions.

18.     Plaintiff will fairly and adequately protect the interests of each member of the Class.  Plaintiff is a shareholder of the Fund who is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

19.     The prosecution of separate actions by individual members of the Class would

create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

20.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.     The History of Mutual Funds and the Purpose of Section 36(b)**

21.     "Mutual funds" are investment vehicles comprised of a pool of funds from many investors who own shares in the fund.   A mutual fund is typically created and managed by a separate entity called a sponsor or investment adviser, and often has no employees of its own. The investment adviser controls the mutual fund, selecting its directors, managing the fund's portfolio of assets and providing other services.  "Because of the relationship between a mutual fund and its investment adviser, the fund often cannot, as a practical matter[,] sever its relationship with the adviser.  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *Jones v. Harris Assocs. L. P.,* 559 U.S. 335, 338 (2010) (internal quotation marks omitted).

22.     Recognizing the inherent conflicts of interest created by nature of the relationship between a mutual fund and its adviser, Congress enacted the ICA in 1940, which established a scheme to regulate mutual funds and protect mutual funds shareholders.  Congress amended the

Act in 1970 to further bolster shareholder protection.  One of the principal methods of achieving this goal was the addition of § 36(b), § 80a-35(b), which imposed a fiduciary duty on investment advisers with respect to compensation received from a mutual fund and granted investors a private right of action for breach of that duty.  Section 36(b), § 80a-35(b) states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

23.     The federal courts have established that the existence of a breach of the fiduciary duty stated in § 36(b) turns on "whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in the light of all the surrounding circumstances. . . . the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones v. Harris Assocs. L. P.*, 559 U.S. at 344. *See also Gartenberg v. Merrill Lynch Asset Mgmt.,* 694 F.2d 923, 928 (2d Cir. 1982).

**B.      The Fund's Organization, Management and Advisory Fee Structure**

24.     The Fund is an open-end mutual fund, registered under the ICA.  The Fund's shares are traded on the New York Stock Exchange.  According to the Fund's most recent Amended Prospectus, dated April 10, 2014, the Fund invests in a portfolio of equity, debt and money market securities.

25.     Like most mutual funds, the Fund does not have employees or facilities of its own, but is operated by an investment adviser.  Pursuant to the terms of the Management Agreement entered into by the Fund with BRA, BRA serves as the Fund's investment adviser, managing the Fund's investments and its business operations.  For these services, in accordance with the terms of the Management Agreement, BRA receives a fee at the annual rate of 0.75% of the Fund's average daily net assets.

26.     Effective June 1, 2012, BRA voluntarily agreed to waive a very small portion of its fees payable by the Fund so that such fee is *slightly* reduced for average daily net assets of the Fund as the Fund grows.  Significantly, the Fund's Prospectus states that this voluntary waiver may be reduced or discontinued at any time without notice.  The voluntary waiver of fees is reduced as follows:

| In excess of | Not Exceeding | Rate Waived to |
| --- | --- | --- |
| $0 | $10 billion | 0.75% |
| $10 billion | $15 billion | 0.69% |
| $15 billion | $20 billion | 0.68% |
| $20 billion | $25 billion | 0.67% |
| $25 billion | $30 billion | 0.65% |
| $30 billion | $40 billion | 0.63% |
| $40 billion | $60 billion | 0.62% |
| $60 billion | $80 billion | 0.61% |
| $80 billion | - | 0.60% |

27.     Notably, the breakpoints (the points at which the fee rate decreases when net assets increase) listed in the above chart result in a "blended rate," meaning the weighted average of the rates by the Fund for each level of asset value.  For example, the fee is 0.75% (or 75 basis points) on the first $10 billion of Fund assets, 0.69% (or 69 basis points) on the next $5 billion, and so on.  This further reduces this financial impact of BRA's voluntary waiver.

28.     Prior to May 13, 2008, the Fund's investment advisory fee rate was determined by the following, more favorable schedule, which provided greater reductions to the Fund's fee rate

than the current fee schedule:

| In excess of | Not Exceeding | Rate Waived to |
|---|---|---|
| $0 | $2.5 billion | 0.75% |
| $2.5 billion | $5 billion | 0.70% |
| $5 billion | $7.5 billion | 0.65% |
| $7.5 billion | $10 billion | 0.625% |
| $10 billion | $15 billion | 0.60% |
| Over $15 billion | -- | 0.575% |

29.     For the fiscal year ended October 31, 2013, BRA received a fee, net of the applicable waivers, at the annual rate of 0.66% of the Fund's average daily net assets.  Set forth below are the management fees paid by the Fund to BRA, as well as the fees paid by BRA to the Sub-Advisers, for the periods indicated:

| Fiscal Year Ended October 31, | Fees Due to BRA from Fund Under Management Agreement | Waived by the Manager BRA | Paid by the Fund to BRA | Fees Paid by BRA to the Sub-advisers |
|---|---|---|---|---|
| 2013 | $459,507,549 | $47,007,200 | $412,500,349 | $235,175,432 |
| 2012 | $442,167,271 | $44,442,476 | $397,724,795 | $261,555,637 |
| 2011 | $429,460,928 | $42,449,146 | $387,011,782 | $253,538,838 |

30.     Rather than directly performing advisory services, BRA delegates the majority of the Fund's investment management services to Sub-Advisors for a fraction of BRA's fee, and has entered into a sub-advisory agreement with Defendant BRIM (and previously with Defendant BRIL).  Under the terms of the sub-advisory agreement, for the services described above, BRA pays BRIM a fee equal to a percentage of the management fee paid to BRA by the Fund under the Management Agreement.  Until July 1, 2013, Defendant BRIL also served as one of the Fund's sub-advisers, and received a similar fee from BRA for its sub-advisory services.  According to a Form 497 filed by the Company on or about March 26, 2014, in fiscal years ending October 31, 2012 and 2013, BRA collectively paid the Fund's Sub-Advisers

$261,555,637.00 and $235,175,432.00.    Thus, in 2012 and 2013 BRA earned over a $136 million and $177 million respectively, for essentially serving as a middle man between the Fund and the Sub-Advisors that provided the actually advisory services for the Fund.

**C.**     **BlackRock's Advisory Fees are Excessive for the Nature and Amount of Work Performed**

31.    Defendant BRA charges the Fund excessive advisory fees for work that is substantially performed in its entirety by the Sub-Advisers for a fraction of the cost.  In this regard, the Sub-Advisers handle the day to day management of the Fund, yet receive a smaller fee from BRA for providing the services that BRA is paid for under the Management Agreement.

32.    For their work in fiscal year 2013, the Sub-Advisors were paid $235,175,432.00 out of the $412,500,349.00 paid to BRA.  The $177.3 million retained by BRA for its oversight of the Sub-Advisers constitutes 43% of the overall advisory fee paid by the Fund (or 75.4% of the fee paid to the Sub-Advisers).  Thus the management fees paid to BRA, and BRA's resulting profits therefrom, are excessive when viewed in light of the nature and quality of the services provided by Defendant BRA.   The fees paid to the Sub-Advisers (only 57% of fee charged by BRA to the Fund) better reflect the value of the investment advisory services than do the fees charged by Defendant BRA.   Indeed, it is logical to assume that the subadvisory fees reflect not only the value of the services provided and the Sub-Advisors' costs incurred, but also a profit.  In fact, when viewed in comparison to other subadvisory fees charged by Defendant BRIM to non-BlackRock affiliated mutual funds, it appears that BRIM's subadvisory fees include a *significant* profit and are themselves excessive for the nature and value of subadvisory services.

33.    In this regard, the sub-advisory fees themselves are excessive and must not be the result of arm's-length negotiation because, as reflected in the following chart, they are significantly higher than the sub-advisory fees paid to Defendant BRIM for advising other funds

11

that were organized and sponsored by financial advisors that are independent of BlackRock and its affiliates.  For example, BRIM serves as a sub-advisor to the following funds which are not managed by BlackRock: (i) the JNL/BlackRock Global Allocation Fund (the "JNL Fund"), managed by Jackson National Asset Management, LLC (ii) the AZL BlackRock Global Allocation Fund (the "AZL Fund"), managed by Allianz Investment Management LLC, and (iii) the Transamerica Global Allocation Fund (the "Transamerica Fund") (collectively referred to as the Sub-Advised Funds).  Like the Fund, the Sub-Advised funds are all open-end management investment companies registered under the ICA.  The Sub-Advised Funds are also all managed by the same team of Portfolio Managers from BRIM as the Fund, Dennis Stattman, Dan Chamby, and Aldo Roldan.  Based on a comparison of subadvisory fee rate and the fees that would be paid to BRIM by the Sub-Advised Funds if they were all the same size as the Fund, the subadvisory rate paid by Defendant BRA to Defendant BRIM resulted in an overpayment of up to $51 million in fees which BRIM would not have received had the subadvisory agreement been negotiated at arm's-length.  This overpayment is in addition to the $177 million retained by Defendant BRA for overseeing the Sub-Advisers.  Accordingly, the Sub-Advisers' fees far exceed the actual cost and market value of the subadvisory services provided to the Fund.

**COMPARISON OF SUBADVISORY FEES[2]**

| Mutual Fund | Sponsor/ Financial Advisor | Sub-Adviser | Effective Subadvisory Fee Rate[3] | Subadvisory Fee Owed to BRIM | Difference Between the Subadvisory Fee Owed to BRIM by the Fund versus the Sub-Advised Funds | Percentage More Paid in Subadvisory Fees by the Fund |
|---|---|---|---|---|---|---|
| **The Fund** | BRA | BRIM | 0.41% | $235,175,432 | -- | -- |
| **Transamerica Fund** | Transamerica Asset Management Inc. | BRIM | 0.3202% | $183,671,557 | $51,503,875 | 28.04% |
| **AZL Fund** | Allianz Investment Management LLC | BRIM | 0.3758% | $215,574,480 | $19,600,952 | 9.09% |
| **JNL Fund** | Jackson National Asset Management, LLC | BRIM | 0.3758% | $215,574,480 | $19,600,952 | 9.09% |

34.     Furthermore, BRA receives additional compensation from the Fund, separate and apart from the advisory fees paid pursuant to the Management Agreement.  For example, in addition to the $412.5 million in advisory fees paid to BRA, in 2013 the Fund: (i) reimbursed BRA $615,357.00 for accounting services; and (ii) paid BRA $764,594.00 pursuant to the terms of a separate Administration Services Agreement for costs associated with maintaining an investor service center.  These fees are in addition to fees paid to other entities for what amounts to the same services.  For example, in fiscal year ended October 31, 2013, the Fund paid State

---

[2] This chart assumes that each of the mutual funds is the same size as the Fund, with approximately $57 billion in assets.

[3] The effective fee rates were calculated using the most recent fee schedule rate disclosed by the Fund and the Sub-Advised Funds and applying such schedule to $57 billion in assets.

Street Bank and Trust Company ("State Street") $4,931,591 for accounting services.

35.     Defendants' markups for both the overall investment advisory fees and the subadvisory fees have resulted in the Fund paying fees that are extremely disproportionate to the services rendered and could not possibly be the product of negotiations conducted arm's-length. Therefore, Defendants have clearly breached their fiduciary duty concerning compensation under § 36(b).

**D.     BRA's Fee Structure Enables BRA to Retain Substantially All of the Benefits Resulting from Economies of Scale, Without Sharing Those Benefits with the Fund and its Shareholders**

36.     The Fund's investment advisory fee arrangement has enabled BRA to retain for itself the vast majority of the benefits of economies of scale resulting from increases in the Fund's assets under management during recent years, without appropriately sharing those benefits with the Fund and its shareholders.  In this regard, it is generally accepted in the mutual fund industry that it is not harder to manage a fund simply because it is bigger.  Since many mutual fund expenses are fixed costs, asset growth reduces the ratio of fund expenses to average net assets.  Therefore, in order to prevent oversized fees, the percentage of assets under management charged as fees by investment advisors must decrease as the assets in the Fund grow.

37.     Unfortunately, the breakpoints established by the Defendants do not allow the Fund and its shareholders to meaningfully benefit from the economies of scale enjoyed by BRA. Specifically, BRA's fee schedule sets the break points too high, too far apart, and reduces the fee by a very small amount, resulting in miniscule (if any) decreases in the Fund's investment advisory fee rate as the Fund's assets grow.   For example, during the 2013 fiscal year, the Fund's net assets grew $4.8 billion from $53 billion to $57 billion, which resulted in over $14.8

million dollars in additional advisory fees for BRA.  Under the current advisory fee schedule, this was insufficient growth to trigger an additional reduction in the advisory fee rate.  So, despite Defendant BRA profiting by over $14.8 million dollars from the near $5 billion increase in net assets upon which its fee is based, zero cost savings were passed on to the Fund and its shareholders.  Moreover, the breakpoint schedule amounts to a voluntary waiver of fees by BRA.  BRA is not contractually obligated under the Management Agreement to reduce its .75% fee rate and, as noted in the Prospectus, BRA may reduce or discontinue the voluntary waiver at any time without notice.    Thus, the increase in fees paid by the Fund has resulted in increased profits for Defendants at the expense of the Fund.

**E.     The Fund's Directors Were Not Acting Conscientiously in Approving BFA's Advisory Fees and Therefore Breached Their Fiduciary Duty to the Fund and its Shareholders**

38.     Pursuant to the ICA, an investment company must have "disinterested" directors on its board of trustees/ board directors in order to protect the fund and its shareholders from abuses resulting from conflicts of interest with the fund's financial adviser.   The Supreme Court has stated that these disinterested directors must act as "independent watchdogs" who supply "an independent check upon the management."  *Burks v. Lasker*, 441 U.S. 471, 484 (1979).  In order to properly perform this watchdog function, the members of a mutual fund's board have a fiduciary duty to the fund and its shareholders to examine all relevant information and to negotiate an advisory fee that is beneficial to the fund and comparable to fees that would be negotiated at arm's-length.

39.     In this case, the Fund's board of trustees (the "Board") breached its fiduciary duty under the ICA by failing to act conscientiously when it approved the Management Agreement and BRA's excessive advisory fee contained therein.   In this regard, the directors are unable to

properly monitor the Fund because they are charged with the oversight of as many as 330 BlackRock affiliated investment portfolios, all with their own prospectus, regulatory filings and compliance requirements.

40.     Furthermore, if the directors were acting conscientiously and were aware of (i) the services provided by the sub-advisers and the sub-advisory fees, as compared to the advisory fees charged by BRA, (ii) the economies of scale enjoyed by BRA, (iii) the profitability of the Fund to the BRA, and (iv) the excessive nature of BRIM's subadvisory fee in comparison to the subadvisory fees paid to BRIM by the Sub-Advised Funds, they would never have caused the Fund to agree to pay such exorbitant advisory fees to BRA.

41.     Additionally, even if the members of the Board technically meet the statutory definition of "disinterested," they are dominated and controlled by BlackRock Inc. and its affiliates and are influenced by the compensation they receive for membership on the Fund's Board, as well as for the other BlackRock affiliated portfolios that they oversee.  In 2013 alone, the Fund's purportedly disinterested directors received the following compensation from supervising the Fund as well as the following aggregate compensation for overseeing additional BlackRock affiliated funds:

| Director | Total Number of BlackRock Affiliated Portfolios Supervised | Aggregate Compensation for Role as Director/Trustee the Fund for Fiscal Year Ending October 31, 2013 | Aggregate Compensation for role as director/trustee from the BlackRock Funds Complex for Calendar Year ended December 31, 2013 |
|---|---|---|---|
| *Disinterested Directors* | | | |
| James H. Bodurtha | 93 | $73,526 | $340,000 |
| Bruce R. Bond | 93 | $61,554 | $305,000 |
| Donald W. Burton | 93 | $61,554 | $305,000 |
| Stuart E. Eizenstat | 93 | $73,526 | $335,000 |
| Kenneth A. Froot | 93 | $61,554 | $305,000 |

| Robert M. Hernandez | 93 | $100,893 | $420,000 |
|---|---|---|---|
| John F. O'Brien | 93 | $61,554 | $305,000 |
| Roberta Cooper Ramo | 93 | $61,554 | $305,000 |
| David H. Walsh | 93 | $73,526 | $340,000 |
| Fred G. Weiss | 93 | 85,499 | $375,000 |
| *Interested Directors* | | | |
| Paul L. Audet | 330 | None | None |
| Laurence D. Fink | 93 | None | None |
| Henry Gabbay | 330 | $46,630 | $661,563 |

42.    Therefore, given the reasons stated above, the Board did not make itself aware of all relevant information and therefore did not act conscientiously when it approved Defendant BRA's investment advisory fees.   This breach of the Board's fiduciary duty resulted in the Fund paying fees that are disproportionate to the value of the services rendered and which could not have been the result of arm's-length negotiation.

43.    The payment of excessive fees to Defendants harms the Fund because the fees are paid out of the Fund's assets and each dollar in fees paid directly reduces the value of the Fund's portfolio.  Thus, the Fund loses investments returns and profits that it could earn on the amount of fees if the fees were to remain in the Fund's portfolio and be available for investment.

## COUNT I

### Against all Defendants for Violation of Section 36(b)

44.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.    Plaintiff asserts this count on behalf of and for the benefit of the Fund.

46.    Defendants are investment advisers to the Fund.

47.    Pursuant to § 36(b) of the ICA, 15 U.S.C. § 80-a-35(b), as investment advisers

Defendants have a fiduciary duty to the Fund and it investors with respect to the receipt of compensation for services and payments of a material nature made to the Defendants.

48.     Defendants breached their duty under § 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by the Defendants and could not have been the product of arm's-length bargaining.

49.     As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duties under § 36(b), the Fund and its shareholders have sustained hundreds of millions of dollars in damages.

50.     Pursuant to § 36(b)(3), Plaintiff seeks to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendants' breaches of their fiduciary duties, including the excessive investment advisory fees by the Fund to Defendants, and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

51.     Alternatively, under § 47 of ICA, 15 U.S.C. § 80a-46, Plaintiff seeks rescission of the Management Agreement and restitution of all excessive investment advisory fees paid the Fund pursuant to the Management Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     An order declaring that Defendants have violated § 36(b) of the ICA, 15 U.S.C. § 80-a-35(b) through the receipt of excessive investment advisory fees from the Fund;

B.     An order preliminary and permanently enjoining Defendants from further violations of § 36(b) of the ICA, 15 U.S.C. § 80-a-35(b);

18

C.      An order awarding compensatory damages against Defendants, including repayment to the Fund of all unlawful and excessive investment advisory fees paid by the Fund from one year prior to the commencement of this Action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.      An order rescinding the Management Agreement pursuant to § 47 of ICA, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment advisory fees paid by the Fund from one year prior to the commencement of this Action through the date of trial, lost investment returns on those amounts, and interest thereon;

E.      An order awarding Plaintiff reasonable costs in this Action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

F.      such other and further relief as the Court may deem just and proper.

Dated:  May 6, 2014                          THE BRUALDI LAW FIRM P.C.


                                             _____s/ Richard B. Brualdi_____
                                             Richard B. Brualdi (RB-1304)
                                             29 Broadway, Suite 2400
                                             New York, NY 10006
                                             rbrualdi@brualdilawfirm.com
                                             Tel:  (212) 952-0602
                                             Fax:  (212) 952-0608
                                             Email:  rbrualdi@brualdilawfirm.com